EVIDENTIARY RULING
All objections raised by counsel at the depositions of Dr. Charles Loomis, M.D. are ruled upon in accordance with the law and the Opinion and Award rendered in this matter.
* * * * * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Joey Barnes. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award.
* * * * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties hereto are subject to and bound by the provisions of the North Carolina Workers' Compensation Act, defendant-employer regularly employing three or more employees at all times.
2. The employer-employee relationship existed between plaintiff and defendant-employer at all times material hereto.
3. Defendant-employer is a duly qualified self-insured.
4. Plaintiff's average weekly wage is $229.00, yielding a compensation rate of $155.59.
5. The following medical records were stipulated and received into evidence:
 a. Murphy Medical Center dated 3/18/92 through 11/16/93;
 b. Dr. Alexander McKinney dated 4/18/92 through 4/22/92;
c. Dr. Stewart J. Harley dated 7/7/92;
d. Dr. Jim Roderique dated 4/6/92 through 8/27/92;
 e. Cheri N. Fitts, R.N. dated 8/21/92 through 3/25/94;
 f. Memorial Mission Hospital dated 11/10/92 through 11/12/92;
 g. Dr. James J. Hoski dated 8/4/93 through 10/12/93;
h. Dr. Ralph Loomis dated 9/23/92 through 1/7/94;
i. Dr. Harry S. Holcomb dated 1/21/94; and
j. Dr. Gary W. Roper dated 11/12/93 through 10/20/94.
* * * * * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. Plaintiff was born 7 August 1949 and began working for defendant-employer in February 1981 as a sewing machine operator. She is a high school graduate with prior work experience as a school teacher and employment with the U.S. Census Bureau.
2. On or about Friday, 13 March 1992, plaintiff was performing her normal and customary duties as a sewer when she reached to get a bobbin of thread at her work station and noticed that she could not lift her right arm to do so because her "shoulder would not go up." Plaintiff informed her supervisor of her complaints and she was instructed to rest over the weekend.
3. Plaintiff returned to work the following Monday and Tuesday. By Wednesday 18 March 1992, plaintiff was unable to use her right arm at all. Plaintiff testified, and advised all of the physicians who have provided treatment in this case, that her complaints were due to a change that was made to her work station over the 1991 Christmas holiday. The change made in plaintiff's work station necessitated a manner of discharging her work that was different from the manner to which she was accustomed.
4. Prior to the onset of her complaints in March 1992, plaintiff experienced a similar episode sometime in 1987 that resolved after several months of physical therapy treatment.
5. Immediately following the development of her complaints in March 1992, plaintiff began receiving physical therapy treatments at Murphy Medical Center, while continuing to work light duty at defendant-employer. After her second session of physical therapy on 23 March 1992, plaintiff reported being "tired" at the end of her treatment. Two days later, on 25 March 1992, plaintiff reported developing headaches. She again reported experiencing headaches over the weekend preceding her physical therapy session of 30 March 1992.
6. Plaintiff received 10 physical therapy treatments at Murphy Medical Center from 20 March 1992 through 2 April 1992 for complaints of neck and bilateral shoulder pain. With no noticeable improvement achieved through physical therapy, plaintiff was referred for an orthopaedic consultation.
7. Plaintiff was initially seen by Dr. Jim W. Roderique, orthopaedic specializing in upper extremities, on 6 April 1992. Suspecting that plaintiff's shoulder complaints may have been related to subacromial bursitis or impingement syndrome, Dr. Roderique injected plaintiff's subacromial area. In addition, Dr. Roderique recommended that plaintiff undergo a neurological consultation.
8. On 17 April 1992, plaintiff was seen by Dr. Alexander McKinney, neurologist, for a neurological consultation. At this time, plaintiff reported to Dr. McKinney that the complaints she was experiencing on the left side had improved and that her primary complaint was neck and right shoulder pain. Plaintiff further reported that her pain began at the thoracolumbar junction and ascended to the back of her neck and out into her shoulders. Dr. McKinney ordered an MRI scan, the results of which were normal. Dr. McKinney could not offer a neurological explanation for plaintiff's complaints, although he did indicate that her joint pain could be related to her psoriatic arthritis, and she was released from his care.
9. Thereafter, plaintiff returned to Dr. Roderique and on 8 May 1992, a bone scan was performed which was reported as normal. Suspecting that plaintiff may have been suffering from myofascial pain, Dr. Roderique recommended trigger point injections, which were performed on 20, 21 and 22 May 1992. After receiving trigger point injections, plaintiff noted improvement in the trigger areas that were injected, but with her improvement she developed "new trigger point areas." By 22 June 1992, plaintiff's predominant complaints were related to neck pain and Dr. Roderique recommended a consultation with an orthopaedic surgeon to rule out a cervical problem.
10. On 7 July 1992, plaintiff was seen by Dr. Stewart J. Harley, orthopaedic surgeon, reporting pain in the right scapula, shoulder and neck areas. She denied any forearm or hand pain. Dr. Harley diagnosed fibromyalgia of the dorsal musculature and scapula area and recommended that plaintiff continue working light duty.
11. On or about 9 September 1992, plaintiff was seen by Dr. Ralph Loomis, neurosurgeon, with continued complaints of neck and right shoulder pain. Plaintiff denied, however, ever experiencing any left-sided complaints. Dr. Loomis recommended a cervical myelogram and CT Scan, the results of which showed a cut-off of the C6 nerve root which was originally thought to be due to a bony encroachment.
12. On 10 November 1992, plaintiff underwent cervical surgery performed by Dr. Loomis for the removal of a "fresh" free disk fragment on the right at C5-6.
13. Plaintiff returned to Dr. Loomis following surgery on 16 December 1992, reporting improvement with the symptoms of numbness that she was previously experiencing in her right arm and hand, but she continued to report muscle spasms in the interscapular area.
14. In March 1993, Dr. Loomis authorized plaintiff to return to light duty employment with the restrictions of no repetitive bending, stooping, reaching, crawling or working on ladders or lifting greater than 30 pounds. Plaintiff returned to work for Lee Company on 29 March 1993. She telephoned Dr. Loomis on 21 April 1993 and 17 May 1993, reporting "new symptoms out onto the left side," including symptoms into the left upper extremity as well as symptoms at the base of her ears, left side of her face, her temple and around her little finger on the left side.
15. Plaintiff worked light duty at Lee Company from 29 March 1993 through 1 June 1993, when she was taken out of work again by Dr. Loomis. A repeat myelogram and cervical CT scan was performed on 20 July 1993, the results of which showed excellent filling of the right C6 nerve root and no abnormalities. Dr. Loomis offered to refer plaintiff to Duke or Emory Universities for an opinion as to her persistent symptoms.
16. Requesting that a second opinion be obtained from a local physician, plaintiff was referred to Dr. James Hoski, a spine specialist.
17. Plaintiff was seen by Dr. Hoski on 4 August 1993. Upon examination, Dr. Hoski noted signs of carpal tunnel syndrome, a positive Phalen's and Tinel's sign. Dr. Hoski's examination further revealed decreased strength in the entire right upper extremity and increased pain with resisted external rotation of the right shoulder. On that occasion, Dr. Hoski opined that plaintiff had reached maximum medical improvement as a result of her cervical injury and further opined that plaintiff was not in need of any further diagnostic work-up or study for her cervical injury. According to Dr. Hoski, plaintiff's complaints were related to myofascial pain.
18. Following his second opinion consultation, Dr. Hoski authorized plaintiff to return to work, but he recommended that she undergo a functional capacity evaluation before doing so. Plaintiff underwent a functional capacity evaluation at Murphy Medical Center, the results of which placed her in the category of light duty work and Dr. Hoski released plaintiff to return to work in that capacity after approving several jobs at defendant-employer that qualified as light duty which plaintiff could perform within her restrictions.
19. On or about 11 November 1993, Dr. Loomis released plaintiff from his care and treatment. At that time, he opined that plaintiff had reached maximum medical improvement and he assigned plaintiff a 10% permanent partial disability of the back as a result of the condition for which he was treating her. Like Dr. Hoski, Dr. Loomis also approved a number of light duty jobs at defendant-employer which he felt were appropriate for plaintiff to perform.
20. Upon releasing plaintiff from his care and treatment, Dr. Loomis referred her to Dr. Philip Royal. In a letter addressed to Dr. Royal dated 11 November 1993, Dr. Loomis noted plaintiff's inquiry "as to why her energy level is so low that it would prevent her from returning to work." Dr. Loomis further stated that he was referring plaintiff to Dr. Royal "to assess this problem."
21. On 12 November 1993, plaintiff was seen by Dr. Gary Roper at Andrews Internal Medicine. On this occasion, Dr. Roper observed an "obviously angry white female in no other distress." Dr. Roper was "uncertain as to the exact etiology of the [plaintiff's] chronic pain."
22. Plaintiff returned to light duty employment for Lee Company on 10 December 1993 and worked through 16 December 1993, when the plant shut down for the Christmas holiday. Plaintiff was scheduled to return to work following the holiday on 3 January 1994, but she failed to do so.
23. Plaintiff was seen by Dr. Harry Holcomb, orthopaedist, on 21 January 1994. At that time, plaintiff reported experiencing no neck pain, although she did complain of some neck stiffness. Plaintiff further reported to DR. Holcomb that her primary complaints of pain existed in the right shoulder region, particularly anteriorly, and in the right axillary region in the upper arm. Plaintiff denied any pain in the forearm and reported occasional swelling and stiffness of the right hand, as well as occasional numbness in all of the fingers of both hands. Plaintiff further reported on this occasion being able to engage only in very limited activity due to fatigue and pain. Dr. Holcomb's assessment of plaintiff's condition was chronic right shoulder and arm pain, etiology uncertain. According to Dr. Holcomb, plaintiff's condition falls into the category of pain syndromes of obscure etiology.
24. Inasmuch as plaintiff continued to report significant symptoms following her cervical surgery, Dr. Holcomb seriously questioned whether plaintiff's herniated disk was the primary cause of her symptoms to begin with. Dr. Holcomb concluded that it was unclear as to how plaintiff's symptoms were linked to her work or how her symptoms may have been caused by her work situation. Like Dr. Loomis and Dr. Hoski, Dr. Holcomb approved several light duty jobs available at Lee Company and he recommended that plaintiff return to light duty employment at Lee Company for four hours per day, advancing her work hours as she improved.
25. Following her consultation with Dr. Holcomb, plaintiff was scheduled to return to work on 24 January 1994, but she failed to do so. Plaintiff did not return to work for Lee Company until 17 February 1994. She worked four hours per day until 25 February 1994, at which time she was terminated for violating the employer's attendance policy. Pursuant to a union contract, employees at Lee Company are assessed points for failing to call the employer to report absences from work. Although Dr. Holcomb released her to return to work four hours per day, plaintiff failed to do so and failed to call the employer from 3 February 1994 through 15 February 1994, during which period she accumulated absentee points which resulted in her termination.
26. Subsequent to her termination at Lee Company, plaintiff has neither sought nor obtained other employment.
27. According to Dr. Loomis, there is no objective medical evidence to support plaintiff's subjective complaints. Moreover, Dr. Loomis is of the opinion that plaintiff is neurologically capable of performing light duty employment and the only restriction that Dr. Loomis could conceive which would prevent her from doing so is her own subjective complaints of pain.
28. Plaintiff's testimony concerning the nature and extent of her alleged pain is not accepted as credible by the undersigned. Plaintiff has reported to several of her treating physicians that she is unable to sit or stand for any appreciable length of time. During the protracted hearing in this cause, however, plaintiff was observed sitting stationary for extended periods of time without displaying any overt signs or expressions of discomfort, i.e., unusual shifting of positions, facial expressions or other body movements suggestive of the type of pain that plaintiff claims to experience after prolonged sitting. Plaintiff's overall demeanor during the entire hearing before the Deputy Commissioner was not indicative of a person who suffers from chronic and disabling pain, particularly after prolonged periods of sitting.
29. In addition to her alleged pain, plaintiff has complained that she suffers from chronic fatigue which she contends is also disabling. According to plaintiff's hearing testimony, her fatigue is so chronic that she gets tired simply sitting on the sofa and trying to hold her head up. For the reasons stated in Finding of Fact Number 28, plaintiff's testimony concerning her allegedly disabling fatigue is not accepted as credible.
30. As a result of her work-related injury, plaintiff was temporarily totally disabled from 10 November 1992 through 28 March 1993 and from 1 June 1993 through 11 November 1993. As of 11 November 1993, plaintiff reached maximum medical improvement from her work-related injury, and as a further result thereof she sustained a 10% permanent partial disability of the back. Inasmuch as plaintiff's testimony concerning the nature and extent of her subjective complaints of pain and chronic fatigue (the two primary components of her alleged disability or inability to engage in gainful employment) is not accepted by the undersigned as credible, plaintiff has not established by sufficient competent and credible evidence that she was incapable of earning the same or greater wages in the same or any other employment subsequent to 11 November 1993. Moreover, plaintiff has failed to establish that it would have been futile for her to seek other suitable substitute employment.
31. The competent and credible evidence in this case establishes that on and after 11 November 1993, plaintiff was capable of returning to employment classified as light duty. Such employment was offered to plaintiff by Lee Company, but her violations of the union contract for failing to report absenteeism after being medically released to return to work lead to her termination and constitutes an unreasonable refusal to accept suitable employment. Thereafter, plaintiff made no effort to seek or obtain any other employment.
32. Plaintiff's violation of the union contract with the employer for failing to report absenteeism after being medically released to return to work constitutes an unreasonable refusal to accept suitable employment. Plaintiff has not made any effort to seek or obtain any other employment, nor has she shown by any competent evidence that it would be futile for her to do so. Plaintiff was working 20 hours per week at her base rate of pay, thus evidencing a diminished wage earning capacity of $76.33 per week.
* * * * * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. As a result of her compensable work-related injury, plaintiff was temporarily and totally disabled from 10 November 1992 through 28 March 1993 and from 1 June 1993 through 11 November 1993. Plaintiff has previously been paid all temporary total disability compensation benefits to which she is entitled for her periods of temporary total disability from 10 November 1992 through 28 March 1993 and from 1 June 1993 through 11 November 1993. N.C. Gen. Stat 97-29.
2. Plaintiff is not permanently and totally disabled as a result of her work-related injury. Id.
3. As of 11 November 1993, plaintiff is capable of performing work classified as light duty, but she has failed to make any attempt to obtain such employment. It would not be futile for plaintiff to seek light duty employment because of pre-existing conditions. Therefore, plaintiff is not entitled to ongoing temporary total disability compensation subsequent to 11 November 1993.Id.; see also Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982) and Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
4. As of 26 February 1994, and as a result of her compensable work-related injury, plaintiff has suffered a diminished wage earning capacity and she is entitled to compensation from Lee Company at the rate of $76.33 per week for so long as she continues to suffer such a loss of wage earning capacity related to her compensable work injury, subject to a maximum recovery period of 300 weeks minus the number of weeks that she has previously been paid temporary total disability compensation or temporary partial disability compensation. N.C. Gen. Stat. 97-30.
5. As a result of her compensable work-related injury, plaintiff is entitled to have paid by Lee Company all medical expenses incurred to 11 November 1993, which are reasonably required to effect a cure, give relief or lessen the disability from her work-related injury; and thereafter, plaintiff is only entitled to have paid by Lee Company those medical expenses incurred or to be incurred which are shown by sufficient competent and credible evidence to be causally related to her injury and which are reasonably required to effect a cure, give relief or lessen the period of disability. N.C. Gen. Stat 97-25.
* * * * * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Plaintiff's claims for permanent and total disability or continuing temporary total disability must be and the same hereby are DENIED.
2. Defendant Lee Company shall pay plaintiff temporary partial disability compensation at a rate of $76.33 per week, for so long as she continues to suffer such a loss of wage earning capacity and subject to a maximum recovery period of 300 weeks, minus the number of weeks that plaintiff has received temporary total or temporary partial disability compensation. The accrued amount shall be paid in a lump sum, subject to a reasonable attorney's fee hereinafter approved.
3. A reasonable attorney fee in the amount of 25% of the compensation benefits due under the above award is hereby approved for plaintiff's attorney, Susan E. Rhodes. Twenty-five percent of the accrued amount shall be deducted and paid directly to plaintiff's counsel. Thereafter, every fourth check due plaintiff shall be deducted from the amount due plaintiff and paid directly to plaintiff's counsel.
4. Defendant Lee Company shall pay all medical expenses incurred, or to be incurred, as a result of plaintiff's compensable injury to 11 November 1993, and shall pay all medical expenses incurred, or to be incurred, subsequent to 11 November 1993 that are shown by sufficient competent and credible evidence to be causally related to plaintiff's injury, to the extent that the same are reasonably required to effect a cure, give relief, or lessen the period of disability, when bills for the same have been submitted to the Industrial Commission and thereafter approved by the Industrial Commission.
5. Defendants shall pay the costs due this Commission.
S/ _______________________ DIANNE C. SELLERS COMMISSIONER CONCURRING:
S/ _______________________ J. HOWARD BUNN, JR. CHAIRMAN
DISSENTING:
S/ _______________________ THOMAS J. BOLCH COMMISSIONER
DCS:bjp